UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK **08 CV 2901**

|  |  |
|---|---|
| HAROLD OBERKOTTER, Individually and On Behalf of All Others Similarly Situated, | ) ) ) |
| Plaintiff, | ) ) |
| vs. | ) ) |
| SOCIÉTÉ GÉNÉRALE, DANIEL BOUTON, and ROBERT A. DAY, | ) ) |
| Defendants. | ) ) |

CIVIL ACTION NO.

**CLASS ACTION COMPLAINT
FOR VIOLATION OF THE
FEDERAL SECURITIES LAWS**

**JURY TRIAL DEMANDED**

Plaintiff Harold Oberkotter brings this action as a class action on behalf of himself and all

other purchasers of the American Depository Receipts ("ADRs") of Société Générale ("SocGen"

or the "Company") and all citizens of the United States who purchased SocGen securities on any

exchange between August 1, 2005 and January 23, 2008, inclusive (the "Class Period"). The

allegations of this complaint are based upon an investigation by plaintiff's counsel of publicly

available information and materials. Plaintiff believes that substantial additional evidentiary

support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.    INTRODUCTION

1.    Société Générale is a financial services group based in France, with offices in

New York City and a significant presence in the United States. It operates three key business

segments: Retail Banking & Financial Services, Global Investment Management & Services, and

Corporate & Investment Banking ("CIB").

2.    During the Class Period, Société Générale and the individual defendants made

materially false and misleading statements and concealed material adverse information regarding:

(1) SocGen's risk management procedures, policy and practices; (2) SocGen's exposure to subprime real estate loans and collateralized debt obligations ("CDOs"); and (3) SocGen's internal controls.

3.    Société Générale represented that it is committed to "conservative provisioning, active risk management and vigilance" and "strict procedures"; that it has "a firm grip" on risk exposure and "a number of highly sophisticated control systems which have already proved their worth in extreme situations" and that "even in extreme situations, the degree of risk remains acceptable" for the Company; that it performs "daily reviews of all positions and risks"; that it has "recognized expertise" in derivative products, securitization and structured finance; and that it has "very little exposure" to the subprime segment of the United States real estate market.

4.    These representations were materially false and misleading. On January 24, 2008, the end of the Class Period, Société Générale disclosed that it had written down more than two billion euros for the fourth quarter of 2007 relating to its United States residential mortgage exposure and its United States monoline insurer exposure. For the full year 2007, Société Générale disclosed on February 11, 2008 that it had written down and made provisions for almost $4 billion in connection with its subprime exposure. The Company also disclosed on January 24 that it had lost almost five billion euros or more than $7 billion dollars as a result of a "massive fraud" by "unauthorized" trading over a period of two years by one of its derivatives traders, Jerome Kerviel.

5.    Two weeks prior to these disclosures, defendant Robert A. Day, and foundations related to him, sold more than $140 million of SocGen stock at artificially inflated prices. Mr. Day is a United States executive and board member of Société Générale. His sales are the

2

subject of investigations by the United States Department of Justice, the SEC, and French regulators.

6.      On February 20, 2008, an interim report issued by three independent SocGen board members, found that SocGen ignored or failed to act upon seventy-five alerts which should have alerted the Company to Kerviel's massive purportedly unauthorized trading activity from 2005 through early 2008. The interim investigative report also concluded that SocGen's "operating staff did not systematically carry out more detailed checks," and certain controls which might have identified the fraud were absent and not provided for.

7.      The disclosures of the truth at the end of the Class Period caused the price of SocGen's ADRs and its other securities to decline, damaging Plaintiff and the Class.

## II.    JURISDICTION AND VENUE

8.      Jurisdiction is conferred by §27 of the Securities Exchange Act of 1934 (the "1934 Act"), 15 U.S.C. §78aa, and 28 U.S.C. §§1331 and 1337. The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and the rules and regulations promulgated thereunder, including Rule 10b-5, 17 C.F.R. §240.10b-5. In connection with the acts alleged in this Complaint, defendants, directly and indirectly, used the means and instrumentalities of interstate commerce including, but not limited to, the United States mail and interstate telephone communications.

9.      Venue is proper in this District pursuant to §27 of the 1934 Act, 15 U.S.C. §78aa and 28 U.S.C. §§1391(b), (c) and (d), because Société Générale maintains offices at 1221 Avenue of the Americas, New York, New York and the offer and sale of Société Générale

ADRs, which trade under the symbol SCGLY, occurred in this District. Moreover, the

Company's ADRs trade on the over-the-counter market in New York and the United States.

## III.    THE PARTIES

10.    As set forth in the accompanying certification, plaintiff purchased Société

Générale ADRs during the Class Period and was damaged thereby.

11.    Defendant Société Générale is a French corporation with operations throughout

the world, including significant operations in the United States, where it "is one of the largest

foreign banking organizations in the United States with approximately 2,900 professionals

working in 13 U.S. cities." Its New York offices are located at 1221 Avenue of the Americas,

New York, New York. In addition, its Asset Management operations have offices at 200 Park

Avenue, New York, New York.

12.    Defendant Daniel Bouton ("Bouton") is and has been Chief Executive Officer of

SocGen since 1993, and Chairman of SocGen since 1997. Bouton frequently communicated to

SocGen's shareholders during the Class Period, including via quarterly and annual "letters to

shareholders" posted on SocGen's website in English, press releases, and other statements.

13.    Defendant Robert A. Day ("Day") is a United States citizen who lists his

professional address as Los Angeles, California. Day is and has been a member of SocGen's

board of directors since 2002. He is Chairman and an investment manager of SocGen's United

States subsidiary, Trust Company of the West ("TCW"). On January 9, 2008, two weeks before

SocGen's disclosure of its massive losses resulting from the purportedly unauthorized trading by

Jerome Kerviel, Day sold €85.75 million ($126.1 million) worth of SocGen shares. On

January 10, 2008, the Robert A. Day Foundation and the Kelly Day Foundation, sold a total of

4

€9.59 million ($14.1 million) worth of shares - bringing the total sold by Day and foundations connected to him, over this two- day period, to over $140 million. The sales were effected at more than $28 per share (based on ADR share prices). Following the disclosures of January 24, 2008, the price of Société Générale securities plummeted to the $20 to $21 range (based on ADR share prices). The United States Attorney for the Eastern District of New York is investigating Day's trades, as are the SEC and French market regulators.

14.     The Individual Defendants held positions in which they possessed the power and authority to control and did control the contents of SocGen's public filings and statements. Each Defendant was provided with copies of SocGen's reports and press releases prior to or shortly after their issuance and had the ability and opportunity to prevent or correct false or misleading statements therein.

15.     SocGen's top executives were involved with all aspects of SocGen's business.

16.     Defendants' positions and access to information made them aware that material adverse facts were being concealed and positive public representations were materially false and misleading.  The Individual Defendants are also liable for "group-published" false statements. Moreover, Day's sales of SocGen stock obligated him to disclose material adverse information that was not publicly available.

## IV.   SUBSTANTIVE ALLEGATIONS

17.     On or about August 1, 2005, the beginning of the Class Period, in a quarterly shareholder publication published in English on SocGen's website, Jean-Pierre Mustier (CEO of SocGen Corporate and Investment Banking and a member of the Company's Board of Directors and Management Board), described the derivatives offered by the Company's Corporate and

Investment Banking arm ("CIB") as "an innovative and effective investment product," stated that "SG CIB is a recognized global specialist in structured finance," and has been implementing "a profitable growth strategy aimed at boosting revenues as well as profits," and aimed to develop its businesses "using a selective, structured approach . . . while at the same time maintaining a firm grip on our costs and risk exposure." (Emphasis added.)

18.    In the same August 2005 quarterly shareholder publication, Mustier also discussed how SocGen purportedly controls its risk exposure, at both the Board level and the level of each individual SocGen agent.  Mustier noted, among other things:

> One of the most important aspects of this business is controlling our exposure to the different types of risk (market risk, credit risk, etc.) in order to limit their impact on our profitability.  Of course, all our risk management is conducted in close conjunction with, and under the permanent supervision of the Group Risk Division.

> The risk of adverse movements in the financial markets is controlled at two levels: Société Générale's Board of Directors first defines a series of global exposure limits that applies to the whole division.  We then break this down into a series of more specific limits for each business activity and agent.  At the same time, we have invested in a number of highly sophisticated control systems which have already proved their worth in extreme situations, notably in the aftermath of 9/11.

Emphasis added.

19.    In February 2006, Société Générale disseminated a quarterly Letter to Shareholders, "confirming the division's recognized expertise in its three key businesses: - in derivative products ...; in the euro capital markets, it earned the . . . No. I position in securitization; [and] a global leader in structured finance. . . ." (Emphasis added.)  It also cited the Company's "broad gamut of expertise" in risk management, and its "ethic of prudence." Didier Haugel, SocGen's Head of Group Risk Management was quoted as stating:

<u>Banking risk covers a broad spectrum</u> and can, for example, arise if a person defaults on a loan repayment or if there is a <u>drop in the market value of a given security</u>.  That said, there is one important distinction: financial risks <u>materialize much faster</u> than industrial risk.

Hence the <u>importance of risk management and the strict procedures</u> it entails.  At Société Générale, the Risk Management Division is expected to contribute as much to the Group's development as it is to the company's bottom line.  <u>A key element in internal control</u>, its role can prove to be a source of tension amongst the operating divisions which is why, to ensure its complete impartiality, <u>it reports exclusively to the General management</u>.  An inherently transverse function, its role is to both advise and audit.  With a primary remit that extends to the definition of suitable methods for the analysis, measurement, approval and monitoring or risks, the division subsequently works alongside the Group's different business lines in defining commercial and product strategies.  Thirdly, given its entirely impartial position, the Risk management Division is called upon to monitor and approve the transaction proposals put forward by the sales mangers and, lastly, centralizes all Group risk issues.  In short, it is up to the risk Division to ensure that the Group is in a position to take informed decisions on the risks that it is prepared to assume in order to enhance its profitability.

*   *   *

And what about risk management in derivatives, a field in which Société Générale ranks as a global leader?

If we rank as a leader in this field it is undeniably because <u>we have looked to develop our expertise therein for over 20 years now</u>.  That said, the growth of this activity has only been possible, and more importantly, acceptable, thanks to the <u>parallel development of a strong expertise in the management of risks linked to derivatives</u>.

At every step in its growth on these markets driven by the dynamism of the business line teams, <u>Société Générale has always been careful to uphold the principles of prudence and rigour that have long applied to traditional banking activities</u>.  Furthermore, given the diversity of the risks at play, <u>we have developed a systematic approach and procedures based on the simulation of various market assumptions including extreme cases such as a stock market crash.  We have thus been able to check that, even in extreme situations, the degree of risk remains acceptable for the Group.  As such, risk management is an integral part of our derivatives activity</u>.

Emphasis added.

7

20.    On February 16, 2006, SocGen issued a press release announcing sharply higher results for 2005. The release further noted that the "net cost of risk declined sharply in 2005," that this "decrease is attributable to the quality of the customer base, but also to the significant rise in the proportion of housing loans which carry a low cost of risk," that the "credit risk environment remained favourable," enabling write-backs in provisions for this risk, and that "market risk was lower." Finally, the release touted SocGen's "recognised expertise" in three key businesses — derivative products, euro capital markets and structured finance.

21.    On March 9, 2006, SocGen filed its 2006 Registration Document with the AMF (French securities regulator). Among other things, the 2006 Registration Document assured investors that SocGen engages in daily analysis "of the exposure and risks incurred by all the Group's market activities and comparison of these exposure and risks with the limits set," "constant analysis of exposure and results," and "daily limit monitoring for each activity, and constant checking that appropriate limits have been set for each activity."

22.    The 2006 Registration Document also contained a "Report of the Chairman on Internal Control Procedures," at pp. 72-81, which noted, *inter alia,* that "internal control is part of a strict regulatory framework applicable to all banking establishments and Group staff," that risk management procedures were defined at SocGen's highest management level, and that 1,900 staff were dedicated to reviewing and controlling risk exposures on a permanent basis. The 2006 Registration Document also claimed that teams of independent risk controllers "carry out daily reviews of all positions and risks taken in the course of the Group's market activities," that any cases where limits have been exceeded were highlighted, that market parameters used to calculate risks and results were verified each day, that precise methods have been defined for

8

evaluating risks, and that controls were further reinforced through targeted action plans.

Investors were also assured that compliance was regularly monitored by SocGen's compliance

department and legal and tax departments, and that inspections were carried out by the Internal

Audit Department and General Inspection Department.

23.    Bouton signed a "Certification of the Person Responsible for the Registration

Document," stating that he certified that the information in the 2006 Registration Document was,

"to the best of [his] knowledge, true and there are no omissions that could impair its meaning."

24.    In June 2006, in a quarterly Letter to Shareholders, Bouton stated:

> For the tenth quarter in a row, the Group's risk expense remained very low as a
> result of an ever-buoyant credit environment and the different measures taken by
> the Group: diversification of its portfolio of businesses and improvement of its
> risk management and hedging techniques.

Emphasis added.

25.    On August 3, 2006, SocGen issued a press release stating that because the credit

risk environment was so favorable, it was able to reverse 54 million euros of earlier bad debt

provisions and that it was actively using credit derivatives for hedging.

26.    On February 14, 2007, SocGen issued a press release reporting sharply higher

earnings for 2006 and touting the Company's "improved risk management techniques and

hedging of high-risk exposure." (Emphasis added.)

27.    On March 6, 2007, SocGen filed its 2007 Registration Document with the AMF.

At page 49 of the 2007 Registration Document, SocGen advised, "The Group will continue its

strict risk management policy, in particular as regards exposure to emerging markets."

(Emphasis added.) In addition, pages 89 through 98 of SocGen's 2007 Registration Document

contained a detailed "Report of the Chairman on Internal Control Procedures." The report noted that "Internal control is part of a strict regulatory framework applicable to all banking establishments and Group staff." The report described six divisions or departments involved in SocGen's internal control, and noted that risk management procedures are defined at SocGen's highest management level. Among other things, the report claimed that "the procedures for managing, preventing and evaluating risk are regularly analyzed in-depth by the Board of Directors and, in particular, its Audit Committee." The report further noted that: "Almost 2,000 staff [are] dedicated to reviewing and controlling [SocGen's] risk exposure on a permanent basis." The report further noted that SocGen's "General Management has adopted <u>a rigorous and coherent approach to reinforcing the management of [operational] risk throughout the businesses</u>" (emphasis added), and described the operational risk function reinforcement procedures.

28.    SocGen's March 6, 2007 report on Internal Control Procedures further described an Internal Audit Department and General Inspection Department control system, and reassured SocGen's investors regarding this control system's effectiveness:

> Given the risks at stake [from operations], each department is provided with the requisite resources, from both a qualitative and quantitative point of view, to carry out its functions effectively.

The report further noted that "a unified set of procedures, tools and methodologies has been implemented," and, after describing these tools, assured investors that "the Group's diverse entities are able to define and implement the necessary actions <u>to ensure that operational risk is maintained at or reduced to an acceptable level</u>." (Emphasis added.)

29.     SocGen's March 6, 2007 report on Internal Control Procedures also assured investors of internal control procedures designed to guarantee the quality of governing SocGen's accounting and financial information, including, among other things, to "ensure the transactions entered in the Group's accounts are exhaustive and accurate."

30.     Bouton signed a "Certification of the Person Responsible for the Registration Document," stating that he certified that the information in the 2007 Registration Document was, "to the best of [his] knowledge, true and there are no omissions that could impair its meaning."

31.     On March 27, 2007, SocGen issued a press release through its Société Générale Securities Services division, in which it touted SocGen's "global reputation and expertise in complex derivative products."

32.     On May 10, 2007, SocGen issued a press release touting "solid performances" in first quarter 2007, which down-played exposure to subprime losses. With respect to subprime, the quarterly release merely noted the following:

> In the first quarter of 2007, the economic environment remained generally favourable, albeit more uncertain in the United States, particularly in the real estate sector. . . . Events in the US real estate markets (defaults by some players in the subprime sector) led to a correction in the equities markets at the end of February. However, the correction was limited and indices ended the quarter at a level similar to that at end-2006.
>
> The market environment remained favourable in Q1 07, with generally sustained activity in corporate and investment banking's different market segments, notably equity and bond markets which enjoyed higher volumes and abundant liquidity. The crises in the debt and equity market segments at end-February was due primarily to the deterioration in credit quality of certain players in the US real estate market operating in the subprime segment (SC CIB has very little exposure to this segment). It fueled a temporary increase in market volatility, which nevertheless returned to historically low levels at the end of the quarter.

Emphasis added.

11

33.    On May 14, 2007, in a message to shareholders at SocGen's annual shareholders' meeting, Bouton stated:

> Over the past 10 years, we have been among the European banks with the strongest growth and profitability, without a major tie-up. In the coming years we can pursue this strategy: we have the right people, quality projects and shareholders' equity to finance them. All of our businesses are profitable and developing. . . .

Emphasis added. Bouton further stated: "Our strategy, combining organic growth and targeted acquisitions, can deliver long-term growth and profitability."

34.    On August 2, 2007, SocGen issued a press release announcing 2Q2007 net profit, and noting that the Company "has low exposure to the current credit market crisis." (Emphasis added.)

35.    In August 2007, SocGen disseminated its quarterly report including a Letter to Shareholders by defendant Bouton stating that SocGen had enjoyed a very good second quarter 2007 against the backdrop of the downturn in the U.S. mortgage sector and that "Corporate and Investment Banking's performance confirms the success of its profitable growth strategy focusing on its three key areas of expertise (derivatives, structured products and euro capital markets)...." It further stated:

> The second quarter of 2007 was marked by a favourable economic environment, notably in emerging countries but also in Europe. In the United States, the distinct slowdown in growth which began in 2006 has continued due to the downturn in the mortgage sector as a whole. Inflation remained under control, although the rebound in oil prices and higher agricultural commodity prices are delaying the end of cycle restrictive policy expectations of the US Central Bank, with the Fed funds rate kept unchanged at 5.25%. . . .
>
> Against this backdrop, the Société Générale Group enjoyed a very good second quarter in 2007. Net banking income for the quarter was up +11.1%*(a), driven by strong organic revenue growth in all the core businesses: the French Networks

12

posted a significant increase in revenues as a result of the dynamic activity for individual and particularly business customers; Corporate and Investment Banking revenues were significantly higher, driven by the good performance of the equities businesses; as for the growth drivers (International Retail Banking, Financial Services, Global Investment Management and Services), they enjoyed very strong growth against the backdrop of an expanding customer base.

Overall, and excluding exceptional items(a), the Group posted a significant increase in its results (net income +14.5%(a) vs. Q2 06), confirming its ability to deliver strong growth in all its core businesses and a high level of profitability (ROE after tax 29.0%).

Emphasis added.

36.    In the same August 2007 shareholder publication, Defendants also touted

SocGen's expertise regarding various financial products:

Corporate and Investment Banking's performance confirms the success of its profitable growth strategy focusing on its three key areas of expertise (derivatives, structured products and euro capital markets)...

Emphasis added.

37.    In the same August 2007 shareholder publication, in a section entitled "Questions

for Daniel Bouton," Bouton assured investors:

Over the last few years, our Group has demonstrated — and will continue to demonstrate in the future — its ability to foster strong growth combined with high profitability. It has the critical mass in its various businesses to be able to position itself vis-a-vis the competition.

Emphasis added.

38.    On September 7, 2007, in an interview with Le Figaro, Bouton stated that

"Concerning our exposure to the subprime crises, we made a statement at the beginning of

August ... the facts have not changed." (Emphasis added.)  When asked by Le Figaro if the

subprime crises will affect SocGen's results, Bouton stressed that only a small part of SocGen's

investment banking business was affected: "Overall, our business model is solid and our strategy is fruitful." Bouton added that strong results in corporate and investment banking are allowing SocGen to diversify its revenues by expanding its foreign retail banking business and specialized financial services activities.

39.    On November 7, 2007, SocGen issued a press release reporting its first profit slide in five years, for 3Q2007. Profits decreased 11.5% from the same period (July through September) during the previous year. SocGen also announced asset write-downs of €404 million (US $587.7 million). SocGen disclosed that €230 million (US $334.6 million) of the write-down for its third quarter was directly attributable to U.S. subprime mortgage exposure. However, the press release downplayed the problems and emphasized "very good results." It stated:

> Daniel Bouton, the Chairman and Chief Executive Officer, has stated: "The third quarter saw very good results for retail banking in France and abroad, the continued expansion of Private Banking and Securities Services, very good commercial performances for the Corporate and Investment Banking businesses, and asset write-downs as a result of the crisis in the financial markets. The Group's results demonstrate the quality of the businesses and the robustness of the portfolio of activities that has been built up in recent years."
>
> The third quarter was marked by the financial crisis caused by the deterioration in the US residential mortgage sector. This resulted (as from August) in the illiquidity of financial instruments secured against subprime assets and strong tensions in credit markets and on interbank market liquidity. Moreover, equities markets were impacted by this very deteriorated environment, with erratic fluctuations in indices and increasing volatility. Although gradually improving, the market environment has not, at this stage, returned to normal.
>
> Retail banking in France and abroad, Financial Services, Private Banking and Securities Services produced very good results. Conversely, the results for Corporate and Investment Banking and Asset management were significantly lower due to the financial crisis and the prudent write-down of some assets. However, Corporate and Investment Banking achieved ROE after tax of 21.1% of Q3 07 thanks to the good commercial performance of its businesses and particularly its Equities activities. Overall, the Group has benefited from the

diversity of its portfolio of activities and generated operation income of EUR 1,775 million in Q3 07 (-7.8%* vs. Q3 06, -7.5% in absolute terms).

40.    On January 24, 2008, the end of the Class Period, SocGen issued a press release disclosing that it had written down €2.05 billion for the fourth quarter of 2007, including €1.1 billion in relation to US residential mortgage risk, €550 million from exposure to US monoline insurers, and €400 million in additional provision to the aforementioned exposures. At the same time, it disclosed that it had "uncovered an exceptional fraud" and suffered losses amounting to billions of dollars because of the trading by Mr. Kerviel.

41.    On February 11, 2008, SocGen issued a press release disclosing that it had written down and taken loss provisions amounting to €2.6 billion (U.S. $3.8 billion) for 2007, over and above the cumulative total of €2.28 billion previously disclosed for the fourth and third quarters. The €2.6 billion in subprime writedowns and provisions, included €1.250 billion related to its portfolio of non-hedged collaterised debt obligations (CDOs), €947 million related to counterparty risk involving monoline insurers, and £325 million related to the trading portfolio of residential mortgage-backed securities (RMBS).

42.    These losses, writedowns and provisions were exacerbated by the 4.9 billion euro ($7.58 billion) loss by the "unauthorized" futures trading by Kerviel. From 2005 through January 18, 2008, Kerviel was a trader on SocGen's Delta One equity derivatives trading desk. He was assigned to perform arbitrage trades, which involved taking advantage of differences in the valuation of correlated assets. Each financial instrument purchased is supposed to be balanced against an offsetting or counterbalancing trade, involving a similar financial instrument

with slightly different values, to benefit from small arbitrage spreads. Such trading involves very little market risk.

43.    Kerviel, however, engaged in massive, high risk "directional" trading, way beyond his limits, and concealed his positions with fictitious counterbalancing trades, and using forged documents and emails to suggest that he had hedged is positions. As Bouton said at a press conference on February 11, 2008 in Paris, Kerviel "was running two books simultaneously, one real and one false."

**Red Flags**

44.    According to an interim investigative report issued by three independent board members, SocGen management failed to follow up on 75 warnings over more than two years about Kerviel's trading, adding to questions about oversight at SocGen.

45.    Among other things, Société Générale received letters directly from Eurex at the end of 2007 raising questions about Kerviel. In a November 7, 2007 letter, Eurex alerted a compliance officer at SocGen that for seven months, Kerviel had engaged in "several transactions" that had raised red flags. The letter also asked whether Kerviel entered transactions automatically or manually. SocGen, taking its time, responded on November 20, 2007; a SocGen risk-control expert replied than nothing was irregular, and that recent market volatility explained a new need for after- hours trading. Eurex sent a second e-mail message to SocGen's compliance department on November 26, 2007, demanding more details and clarification of several suspicious trades by Kerviel. This was the second letter in less than three weeks questioning Kerviel's investment strategy. SocGen provided additional details on December 10, 2007, and then both SocGen's risk managers and Eurex let the Kerviel matter drop.

46.    Kerviel also built up a €1,000 per month cell-phone bill, despite working in an office with telephones. The unusually high cell-phone bills, which investigators are now examining, suggested that others could be involved, according to Jean Veil, a lawyer for SocGen. Kerviel is being held in a Paris prison and he and others have been questioned by judicial officials.

**A Culture of Risk**

47.    On February 5, 2008, <u>The New York Times</u> reported that, in addition to failing to sufficiently investigate after receipt of Eurex's warnings, other missteps by SocGen, and a "culture of risk" at SocGen resulted in Kerviel's losses:

> Overlooking the warnings by Eurex about Mr. Kerviel was only one of a series of missteps by Société Générale that led to his staggering loss.
>
> The 144-year old bank <u>allowed a culture of risk to flourish, creating major flaws in operations that enabled the rogue trader's activities to go undetected</u>, according to bank officials, investigators and traders who worked with Kerviel.
>
> <u>Far from being discouraged from placing big bets</u>, Société Générale <u>traders were rewarded for making risky investments with the bank's money. It was not uncommon for traders to briefly exceed limits imposed on their trading before pulling back, despite controls meant to prohibit this.</u>
>
> While management depicts the 31-year-old Mr. Kerviel as a lone operator who spiraled out of control, interviews with current and former Société Générale employees suggest that he was also the product of an environment where risk taking was embraced, as long as it made money for the bank.
>
> The damage wrought by Mr. Kerviel comes in the wake of two trends that reshaped Société Générale: the explosive growth of its derivatives business and its use of its own money to make bets on the market, known as proprietary trading.
>
> Throughout Société Générale's sprawling derivatives business, said one current employee who used to work with Mr. Kerviel, <u>traders were encouraged to make proprietary bets, even on desks that specialized in what top executives called "plain vanilla products," like the team where Mr. Kerviel worked, Delta One.</u>

"You must take positions, even if you are not a proprietary trader," said this employee, who insisted on anonymity because he was not authorized to talk to the press. "During appraisals by bosses, they made it clear you were judged by how well you did your basic job, as well as how much money you made on prop trades."

Mr. Kerviel told French prosecutors as much. Asked if his superiors knew of his activities, be said, "at the beginning, just as at the end of my maneuvers, they didn't want to intervene," adding, "They know the machinery."

Emphasis added.

48.    The New York Times article noted that, according to analyst Pascal Decque, SocGen's willingness to take risks also was reflected by its loss of over €2 billion from subprime-related investments, twice the size of the losses of BNP Paribus, even though BNP is a larger bank than SocGen.

**Internal Knowledge of Kerviel's Trading**

49.    Kerviel's trading appears to have been known within SocGen, which recklessly turned a "blind eye" to the unauthorized trading, contrary to Defendants' representations to investors throughout the Class Period regarding SocGen's strict controls on risk and daily-implementation of internal controls on all trading positions.

50.    On February 15, 2008, The New York Times reported that a confidential source who was well-acquainted with the trading controls at SocGen said that it was "inconceivable" that Kerviel's immediate supervisors were not alerted after his trades set off alarm bells at Eurex (the derivatives exchange based in Frankfurt). The source reported that on a least one occasion in late 2006 or early 2007, Kerviel made a €500,000 profit on a one-way bet. As Kerviel's role was not to speculate with SocGen's money, Kerviel was reprimanded by his bosses, who said his profit would not be included in the tally used to calculate year-end bonuses. According to the

18

source, this incident would have been sufficient grounds to fire Kerviel, and Kerviel would normally have been watched closely afterward, and not allowed to take additional risks. The source's report lent credence to Kerviel's claims, during Kerviel's interrogation by the French financial police in late January 2008, that his superiors, who were experienced foreign traders, received clear and repeated warnings that Kerviel was trading beyond his limits.

51.    Kerviel also told police that his supervisors in the Delta One derivative trading office, Martial Rouyere (head of Delta One) and Eric Cordelle (Royere's deputy), were familiar with his overreaching limits since April 2007. Further, Moussa Bakir, a broker at SocGen's futures brokerage, Newedge, told police when he was questioned that he knew that Kerviel had a problem with his bosses. On January 29, 2008, the Associated Press reported that a judicial official said that Kerviel told investigators that he believes that his bosses at SocGen were aware of his massive risk-taking but turned a blind eye as long as he earned money. According to excerpts of Kerviel's testimony published in Le Monde newspaper, Kerviel told investigators: "I can't believe that my superiors were not aware of the amounts that I was committing, it is impossible to generate such profits with small positions." Kerviel's remarks were confirmed by Isabelle Montagne, a spokeswoman for the Paris prosecutor's office.

52.    On March 14, 2008, The New York Times reported that Kerviel told French investigators that Thomas Mougard, an assistant on his desk, conducted at least one large fictitious transaction last spring on the computer of their supervisor Eric Cordelle, as the supervisor looked on. Mr. Kerviel told investigators that he was making speculative bets of as much as $925 million "at the workstation of his direct superior, Eric Cordelle, and in his presence." Mr. Mougard said that he "could not exclude" the possibility that on some occasions

he "may have forgotten to log off when he was using Jerome Kerviel's workstation to access certain timely information."

53.    Kerviel told police that other traders and managers hid gains and losses to smooth over earnings, and that his superiors must have been aware of what he was doing.  He said his managers went along because they too would have been fired had his unauthorized trading been exposed.

54.    In an interview by Maria Baritiromo published in <u>Business Week</u> on February 11, 2008, French Finance Minister Christine LaGarde also acknowledged SocGen's awareness of irregular trades early on:

> Q (Baritoromo): It has been reported that, according to prosecutors, SocGen was made aware of irregular trades in 2005.  And then in November of last year [2007], they were again made aware of questionable trades by this very same trader.

> A (LaGarde): It's certainly going to be part of our investigation, and I have my people working on that at the moment.  I'm going to see what the governor of the central bank and the president of the AMF, which is the equivalent of the SEC, have to say about why they did not disclose earlier.

## Lack of Functional Controls and Risk Management

55.    On February 4, 2008, French Finance Minister Christine Lagarde submitted an 11-page report to the French prime minister on the SocGen trading scandal.  The reported noted that SocGen took too long to report the suspicious activity to government officials.

56.    Lagarde's harshest comments concerned SocGen's controls.  Lagarde told reporters after submitting her report, "Very clearly, certain mechanisms of internal controls of Société Générale did not function, and those that functioned were not always followed by appropriate modifications."  Among problems the report cited at Société Générale were cracks in

the wall separating the trading floor and the offices where trades are controlled; problems with computer passwords and other security measures; and "atypical behavior" such as Kerviel not taking vacation days that went unnoticed.

57.    During her Business Week interview on February 11, 2008, in response to a question as to what could be done to avoid future SocGen-type situations, French Finance Minister LaGarde discussed the need for three types of transparency: transparency of financial instruments (LaGarde noted that this "addresses the subprime issue"), transparency of the entire reality of financial institutions' balance sheets and accounts, and transparency of relationships within trading rooms and between trading rooms and control areas.

58.    Various experts also criticized SocGen's risk management procedures, in light of SocGen's trading loss pertaining to Kerviel.  Joseph Mason, a risk-management researcher and professor of finance at Drexel University in Philadelphia, stated "I find it really improbable that this trader was not abetted by at the very least incompetence, if not assistance from others. Ultimately, we're talking about a breakdown of fundamental operational controls."  According to Francis Hontmongandji, a corporate governance expert who is also president of the French chapter of the Association of Certified Fraud Examiners, given that Mr. Kerviel was able to exceed trading limits and evade detection for so long, as well as Société Générale's handling of Eurex's November warnings, "we can easily infer that the internal controls were either inadequately designed or have not been operating effectively and efficiently."  David Moss, a fund manager at F&C Asset Management in London, said "the systems controls didn't function."

21

**Indications That Kerviel Did Not Act Alone**

59. News reports in mid-February indicated that police investigating the trading scandal at Société Générale were leaning towards a theory that Kerviel, whom the bank blamed for losing nearly US $7.2 billion, might not have acted alone, as he and the bank have claimed. The police had been sifting through nearly 2000 pages of instant message traffic that Jerome Kerviel had sent. The police believed that Kerviel may have been trying to protect a friend who appeared to have helped him cover his tracks.

60. The instant message exchange added to doubts about Société Générale's explanation that Kerviel had engaged in the trades alone.

61. Investigators suspected that Moussa Bakir, 32, a broker at the futures brokerage Newedge, a Société Générale subsidiary, sent Mr. Kerviel a forged email message from Deutsche Bank, purporting to confirm a sizeable trade in German DAX index futures that did not exist.

62. Late on the afternoon of January 18, 2008, the day Société Générale said it uncovered roughly US $74 billion worth of fictitious trades by Kerviel, Mr. Bakir indicated in a message exchange over the Reuters terminal system that he would send Kerviel documentation for an unspecified transaction. "I'm sending you the conf," Bakir wrote, using the shorthand for the confirmation of a trade.

63. Kerviel and Bakir's messages -- which indicated that they continued many of their conversations on mobile phones suggested that Bakir had an intimate knowledge of Kerviel's surreptitious trading.

## V.     THE TRUTH BEGINS TO EMERGE

64.     After repeatedly assuring investors during the Class Period that SocGen's subprime exposure was minimal, and that SocGen had comprehensive internal controls and risk management procedures, involving the careful and prudent monitoring of all trades, investors were shocked on January 23, 2008 (the last day of the Class Period), when market rumors indicated that SocGen had significant exposure to subprime CDOs and RMBS which would require substantial additional writedowns.

65.     Investors were further shocked by SocGen's announcement at 2:00 a.m. E.S.T. on Thursday, January 24, 2008 (before the markets opened) of €4.9 billion of losses due to Kerviel's trading and €2.05 billion of writedowns related to (subprime) "credit market turbulence." As a result, SocGen's ADRs fell $1.95, from a close of $24.25 on January 23 to close at $22.30 on January 24, 2008 (and continued to drop over the next 2 trading days to $21.50), on extremely heavy trading volume.

66.     After two years of unauthorized trading by Kerviel, according to SocGen, on Friday, January 18, 2008, a routine check found a trade that exceeded the bank's limits. A call to the other party in the trade found the transaction didn't exist. Kerviel had built up €50 billion of positions -- which was more than the entire market capitalization of the Company — in European stock index futures and disguised them with fake hedges.

67.     SocGen quickly unwound Kerviel's positions on January 21, 22 and 23, 2008, and then announced on January 24, 2008 that it uncovered a $7.14 billion fraud - one of history's biggest as well as additional subprime losses.

23

68.    SocGen stated that it lost €4.82 billion ($7.09 billion) in cleaning up unauthorized transactions by Kerviel. The trading loss, and losses from the crisis in U.S. subprime mortgage loans, wiped out the bulk of SocGen's net profit for 2007. SocGen said it would be forced to seek $8.02 billion in new capital.

69.    SocGen also announced that Kerviel confessed to the fraud, and was being dismissed from his position at SocGen. Kerviel's supervisors were also to leave SocGen. Chief Executive Daniel Bouton offered his resignation, but the board rejected it. (SocGen made a number of personnel changes in its derivative business, and replaced its co-heads of fixed income, Marc Bruillout and Gregorie Varenne.)

70.    In a press release issued January 27, 2008, entitled "Explanatory note about the exceptional fraud," SocGen described Kerviel's methods, including fictitious operations which gave an appearance of offsets to the actual portfolio operated by Kerviel. The press release set forth a time line purporting to describe the conditions under which the fraud was uncovered, as follows: Under the entry for January 18, 2008, SocGen admitted that "abnormal counterparty risk on a broker [was] detected several days earlier [several days prior to Friday January 18, 2008]." The press release claimed that the team to start investigating the situation was created on January 18, 2008, and that on January 19, 2008, Kerviel acknowledged committing unauthorized acts and creating fictitious operations. By Sunday January 20, 2008, Kerviel's positions, amounting to approximately €50 billion, were identified, and Bouton informed the Governor of the Banque de France. An Audit Committee meeting was convened that afternoon to examine the results for 2007 and writedowns related to US residential mortgage assets (in particular' CD0s). At this meeting, Bouton informed the Audit Committee of the trader's position which

24

had been uncovered. Bouton then also informed the general secretary of the AMF. From January 21 through 23, 2008, SocGen unwound Kerviel's positions in a measured fashion, under unfavorable market conditions.

71.    The press release noted that before the markets opened on Thursday, January 24, 2008, the existence of the fraud was announced, and SocGen asked for trading in its shares to be suspended. It also noted that investigations were under way by SocGen's General Inspection division and Banque de France.

72.    On January 28, 2008, investigating judges filed preliminary charges against Kerviel, after questioning him for 48 hours. The preliminary charges were for breach of trust, "forgery and using forgeries" and unauthorized computer activity, which could bring Kerviel up to three years in prison and hefty fines. Such preliminary charges allow the magistrates time to further investigate and to decide whether to send the case to trial. The prosecutor said that in November 2007, Eurex "became concerned" by a position taken by Kerviel. However, Kerviel was able to wiggle out, the prosecutor said.

73.    On or about January 29, 2008, the ADAM organization, which represents the interests of small shareholders, asked France's AMF financial markets regulator to investigate SocGen. ADAM President Colette Neuville said in a letter that she was surprised by the difference between a reassurance given over SocGen's subprime debt position in September 2007, and the €2.05 billion ($3.03 billion) in additional write-downs announced on January 24, 2008. Ms. Neuville also asked AMF to look into possible insider dealing because the share price of SocGen started to fall from January 14, 2008, ten days before the announcements of the €4.9 billion in trading losses and additional subprime writedown, and planned capital increase.

25

74.    On January 30, 2008, SocGen director Jean-Martin Folz issued a press release, stating that SocGen's Board of Directors met on January 30, 2008, and decided to form a special committee of independent directors, comprised of Jean Azema, Antoine Jeancourt-Galignani, and Jean-Martin Folz (who was appointed Chairman of the special committee) to launch an independent, thorough inquiry into the fraud.

75.    On February 8, 2008, a Paris court ordered that Kerviel be placed in pre-trial custody, reversing a ruling the previous week that Kerviel could remain free while his case was being investigated. Kerviel is being investigated on accusations of forgery, breach of trust and illegal computer use.

76.    On February 9, 2008, after two days of questioning by the police, Moussa Bakir, a broker at FIMAT who exchanged emails with and executed trades for Kerviel, was released without charge.

77.    Kerviel's trading losses, along with the writedowns and provisions linked to the U.S. subprime mortgage crash, forced Société Générale to raise €5.5 billion from shareholders in February 2008 to replenish capital. SocGen said it would sell shares in a rights offer at €47.50 each, a discount of 39% to the closing price on February 8, 2008. Analysts had expected a discount of as much as 30%.

78.    On February 11, 2008, Société Générale also filed a lawsuit against "a 31-year-old person" for creating fraudulent documents, using forged documents and making attacks on an automated system, according to Clarisse Grillon, a spokeswoman for the Nanterre prosecutor.

79.    In February, 2008, a French magazine, Le Nouvel Observateur, printed nearly 2,000 pages of electronic messages which Balch and Kerviel exchanged between early October

2007 and January 18, 2008, Kerviel's last day at SocGen. According to reports, SocGen also provided the email messages to prosecutors, In one message, sent on November 30, 2007, Bakir said that in his opinion, Kerviel's actions were not "illegal in terms of the law."

## The Interim Investigative Report

80.     On February 20, 2008, an interim report from the inquiry by three independent SocGen board members, chaired by former Peugeot Citroen chief executive Jean- Martin Folz, was published. The initial findings were reviewed by auditors at PricewaterhouseCoopers. The investigative report stated that Kerviel began making unauthorized transactions beginning in 2005, almost immediately after he moved to SocGen's Delta One equity derivatives trading desk. Lapses in the internal controls let the trades go undiscovered until January 2008. According to the report, Kerviel initially bought options and warrants on individual stocks, including Allianz, Deutsche Bank and Porsche. In 2007, Kerviel moved on to take large positions on stock index futures and forwards. Beginning in March 2007, Kerviel built up a short position in index futures that reached a notional value of €28 billion by June 30, 2007. That position was unwound in November, 2007, resulting in a profit of €1.5 billion. In January 2008, Kerviel took €49 billion of long positions on index futures. SocGen incurred €6.4 billion of losses unwinding these positions from January 21 to 23, 2008. The report confirmed that SocGen's "global loss" from Kerviel's trading (apparently after netting gains against losses) was €4.9 billion.

81.     The investigative report catalogued 75 instances when Kerviel's trading raised alarm bells, and better systems might have prevented the alleged fraud. The report said that SocGen management failed to follow up on 74 of the warnings over more than two years about Kerviel's trading, adding to questions about oversight at SocGen. Its response came only after

27

the 75 warning. In some cases, the report said that "operating staff did not systematically carry out more detailed checks" of Kerviel's trades. The report also found that "no initiative was taken to verify the truth of [Kerviel]s assertions or to transmit the information to immediate supervisors." The report also said that some work still needed to be done to confirm that the entire impact of Kerviel's trading has been identified.

82.    Although the internal inquiry also found that Kerviel's allegedly unauthorized trading had not been detected because of Kerviel's sophisticated techniques, it also pointed the finger at internal audit and risk control failures. The inquiry also highlighted that controllers did not "systematically carry out more detailed checks" and pointed to an absence of controls likely to identify fraud. The report suggested the strengthening of three areas, namely, computer security, procedures to tip off the management of wrongdoing, and stronger human resources checks.

83.    The committee report also said that the 75 red flags between June 2006 and the beginning of 2008 should have alerted managers to Kerviel's unauthorized trades. The warning signs included a trade with a maturity date on a Saturday, trades with "pending" counterparties, and trades with missing broker names, according to the investigative report. The report said that while procedures were respected and questions were asked, "no initiative was taken" to check Kerviel's assertions, "even when those lacked probability." Moreover, "the next level of superiors failed to react when notified."

84.    The interim investigative report indicated that the independent committee would continue its work and present an update at SocGen's shareholders' meeting on May 27, 2008.

85.    SocGen's shares fell 28 percent during the first two months of 2008, compared with a 16 percent decline in the 60-member Bloomberg European Banks and Financial Services Index. The decline exceeded the 19 percent slump in BNP Paribas SA, France's biggest bank, which reported a 42 percent drop in 4Q2007 profit to €1.01 billion on February 20, 2008.

**SocGen's Announcement of 4Q 2007 and FY 2007 Results**

86.    On February 21, 2008, SocGen issued a press release announcing that unauthorized trading and subprime-related writedowns led to a record €3.35 billion ($ 4.9 billion) fourth-quarter loss. This net loss compared with profit of €1.18 billion in 4Q2006. For the full year of 2007, SocGen announced that its net income fell to €947 million from €5.22 billion, matching preliminary results announced on February 11, 2008. SocGen blamed the reversal mostly on unauthorized trades by Kerviel, whose positions led to €4.9 billion of trading losses, and on the effects of the serious financial crisis on SocGen's Corporate and Investment Banking and Asset Management activities. Although SocGen claimed that it did not discover Kerviel's positions until January 18, 2008, Société Générale booked the losses in the fourth quarter of 2007.

87.    SocGen also said in its February 21, 2008 press release that it would cut its dividend to €0.90 a share from €5.20, maintaining a policy of paying out about 45 percent of profit.

88.    Frederic Oudea, SocGen's chief financial officer, said on the conference call that some further writedowns in money market funds may be necessary in the first quarter of 2008 if credit markets do not improve.

29

## VI.    LOSS CAUSATION

89.    As a result of Defendants' false and misleading statements and omissions described herein, the price of SocGen's ADRs was artificially inflated during the Class Period, causing harm to Plaintiff and other Class members. Plaintiff and the Class suffered actual economic loss when the risk, subprime exposure and internal control problems and their adverse impact were disclosed to the market, causing the inflation to be removed from SocGen's ADR price.

90.    Investors were shocked on January 23, 2008 (the last day of the Class Period), when market rumors indicated that SocGen had significant exposure to subprime CDOs and RMBS which would require substantial additional write-downs. SocGen further shocked investors by announcing, at 2:00 a.m. E.S.T. on January 24, 2008, €4.9 billion of losses due to Kerviel's trading and €2.05 billion of write-downs related to (subprime) "credit market turbulence." As a result, SocGen's ADRs fell $1.95, from a close of $24.25 on January 23 to close at $22.30 on January 24, 2008 (and continued to drop over the next 2 trading days to $21.50), on extremely heavy trading volume (over 2,500,000 ADR shares), removing the artificial inflation from the ADR stock price. As a direct result, Plaintiff and the Class suffered economic loss, i.e., damages under the federal securities laws.

## VII.    CLASS ACTION ALLEGATIONS

91.    This class action is brought pursuant to Fed. R. Civ. P. Rule 23 on behalf of all persons who purchased SocGen ADRs during the Class Period (the "Class"), and all U.S. citizens who purchased SocGen securities on any exchange, excluding Defendants, SocGen's

officers and directors, and their immediate families, legal representatives, heirs, successors or

assigns and any entity in which Defendants have or had a controlling interest. Class members are

so numerous that joinder is impracticable. SocGen has millions of ADRs outstanding, owned by

numerous persons. Average weekly trading volume of SocGen's ADRs during the Class Period

was approximately 147,060 ADRs per week.

92.     Questions of law and fact common to the Class predominate over questions

affecting individual Class members. Common questions include: (a) whether Defendants

violated the 1934 Act; (b) whether Defendants omitted and/or misrepresented material facts; (c)

whether Defendants knew or deliberately disregarded that their statements were false and

misleading; (d) whether SocGen ADRs' price was artificially inflated; and (e) the extent and

appropriate measure of damages.

93.     Plaintiff's claims are typical of those of the Class. Plaintiff and the Class

sustained damages from Defendants' wrongful conduct. Plaintiff has no interests conflicting

with the Class and will adequately protect the Class' interests. Plaintiff has retained experienced

securities class action counsel. A class action is superior to other available methods for the fair

and efficient adjudication of this controversy.

### FIRST CLAIM FOR RELIEF

#### For Violation of §10(b) of the 1934 Act
#### and Rule 10b-5 Against All Defendants

94.     Plaintiff incorporates the foregoing allegations by reference.

95.     During the Class Period, Defendants violated § 10(b) of the 1934 Act and Rule

10b-5 by: (a) employing devices, schemes, and artifices to defraud; (b) making untrue statements

of material facts or omitting material facts needed to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaging in acts, practices, and a course of business that operated as a fraud or deceit upon the Class. Defendants also failed to disclose material adverse information in connection with their insider sales of SocGen stock.

96.     The market for SocGen securities was open, well-developed and efficient at all relevant times. Defendants' materially false and misleading statements and omissions caused SocGen ADRs and other securities to trade at artificially-inflated prices during the Class Period. Plaintiff and the Class were damaged because they acquired SocGen ADRs and other securities relying upon the market's integrity, and would not have purchased at the prices they paid, or at all, if they had known that Defendants' misleading statements and omissions artificially inflated market prices, and because when the truth was revealed, SocGen's ADRs and other securities declined dramatically, directly causing investors' losses.

## SECOND CLAIM FOR RELIEF

### For Violation of §20(a) of the 1934 Act,
### Against Individual Defendants

97.     Plaintiff incorporates the foregoing allegations by reference.

98.     The Individual Defendants acted as controlling persons of SocGen within the meaning of §20(a) of the 1934 Act and are liable thereunder. As officers and/or directors of SocGen, owners of SocGen stock, and "hands on" managers, the Individual Defendants had the power and authority to cause SocGen to engage in the wrongful conduct complained of herein.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on behalf of himself and the Class, prays for judgment as follows:

A.     declaring this action to be a plaintiff class action properly maintained pursuant to Rule 23(a) and (b) (3) of the Federal Rules of Civil Procedure;

B.     appointing Plaintiff as lead plaintiff and class representative and his counsel as lead class counsel;

C.     awarding Plaintiff and other members of the Class damages together with pre-judgment interest thereon;

D.     awarding Plaintiff and other members of the Class their costs and expenses of this litigation, including reasonable attorneys' fees, accountants' fees and experts' fees and other costs and disbursements; and

E.     awarding Plaintiff and other members of the Class such other and further relief as may be just and proper under the circumstances.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED:     March 19, 2008
              New York, New York

                                  **WEISS & LURIE**

                                  Joseph H. Weiss (JW-4534)
                                  James E. Tullman (JT-9597)
                                  Richard A. Acocelli (RA-2029)
                                  551 Fifth Avenue
                                  New York, New York  10176
                                  (212) 682-3025
                                  (212) 682-3010 (Fax)

                                  **STULL, STULL & BRODY**
                                  Jules Brody (JB-9151)
                                  6 East 45th Street
                                  New York, New York 10017
                                  (212) 687-7230
                                  (212) 490-2022 (Fax)

                                  Attorneys for Plaintiff